1-5-3116 Don Stojetz v. Todd Ishee. For argument, 30 minutes per side, Mr. Benza for the appellate. Good morning. I mean, good afternoon, I should say. Mike Benza on behalf of Mr. Stojetz. Good to have you. Are you reserving time for, how much? Yes, I'm reserving five minutes. Okay, great. And along with co-counsel Mark Devan on behalf of Mr. Stojetz. I'd like to focus the argument this afternoon on first two assignments of error. Of course, if the court has questions about the other issues, I'm happy to discuss those. The first assignment of error is whether or not trial counsel was ineffective in failing to conduct and ask for a voir dire on the issue of racial animus in this case. Under Turner v. Murray, defendant has an absolute right to inquire about the issue of racial bias in an interracial or cross-racial case. In this type of case especially, that issue is even more stark than simply a white on black crime. Instead, this case takes place in the context of a prison here in the state of Ohio involving the white prison gang, the Aryan Brotherhood, and the African American prison gang of the Folks Nation. This case started when the Folks Nation attacked a white inmate, juvenile inmate at Madison for the purpose of starting a battle between the Folks Nation and the Aryan Brotherhood. Is that a conceded fact or is that just testimony by a few people? It's testimony by a few people that that was the motivation for the attack on Doug Haggerty. Not what your side says, right? I'm sorry? Does the state agree that that's the motivation? I don't know what the state thinks the motivation is, but it's clear that Doug Haggerty was attacked by the Folks Nation. Doug Haggerty was not a member of the Aryan Brotherhood, but he was being protected by the Aryan Brotherhood. There's also testimony coming from post-conviction that the Folks Nation was gearing up to attack John Stojets directly in the Aryan Brotherhood as well. And that was what led to the Aryan Brotherhood launching this assault on the juvenile facility within Madison. What about this Hughes case in our circuit that says that to show prejudice for an ineffective assistance of counsel claim based on the failure to strike a biased juror, the petitioner must show that the juror was actually biased against him, and we don't have any showing in this case that any juror was racially biased. Correct. And the issue for development of those factual issues, there's a number of different procedural problems. One, that issue was not developed in state post-conviction because the issue was raised on direct appeal. It was decided on the direct appeal by the Ohio Supreme Court. So the issue of trying to re-raise that in state post-conviction, as this court is well aware, Ohio has a very liberal use of race judicata to prevent further litigation in state post-conviction on issues that are raised on the direct appeal. So you're saying the issue was raised on direct appeal. How was it raised? The issue under Turner was raised before the Supreme Court. Yes. Because the way you stated it was Turner says you have an absolute right to ask, but it doesn't say you have a duty to ask, does it? It does not. It does not say that you have a duty. But in Turner itself, it recognizes that it is incumbent upon defense counsel to make the request, and that's where the issue of ineffectiveness comes in. When you say incumbent upon, that sounds like a duty, and if it's a duty, then it means you can't make a strategic decision that, especially in this context, that maybe you don't want to raise racial issue in the sense that one could imagine a lawyer saying, well, gee, black jurors are not going to be sympathetic to your defendant, and the more we emphasize it, the less sympathetic we're going to be, and lots of white jurors are not going to be, and I thought part of the defense was, in effect, this sort of warfare protection, but not especially racial protection, that you said they attack me, I'm going to attack them, not I'm out to get them because of their race, and I would think the defense attorney would very well want to play it down. And that might be a case in a different factual situation. This case was rife with racial animus from the very beginning. Racial animus between the people, but how do you play that in picking jurors, as opposed to the fear of tripping over your own feet and making it worse? I don't think, given what the defense lawyers knew prior to trial, and that is that their entire investigation in this case was relying on the files the prosecutor gave to them. They were pretty extensive in this case, weren't they, if I recall? No, they weren't. As the post-conviction record demonstrated, there were lots of things that defense counsel should have been able to find. But there was a heck of a lot they did get, if I recall. They did. The prosecutor turned over a lot of materials, but all of those materials demonstrated that the issue of race was going to be front and center in this case. Well, in what sense? I mean, obviously, the guy's a member of the Aryan Brotherhood, and there are two gangs that are, one composed primarily of whites, I guess, and the other composed of black inmates. It's not primarily, Judge, it's exclusively. Okay, well, I don't think that matters. So, I mean, it's obvious that there's a racial element to the underlying facts, but it's less obvious to me that counsel had a strategic imperative to dwell on that in a case where his defendant is a member of the Aryan Brotherhood, usually not an endearing trait to jurors. And that's exactly why they should have done the voir dire. They should have asked the jurors. But he could just choose to sort of, you know, minimize the airtime that that issue gets at the trial, couldn't he? No. What Supreme Court case? Turner's not the case because Turner says he has the right to ask. What Supreme Court case would make obvious to the Ohio courts that on this fact pattern, he had an obligation to ask? There isn't a Supreme Court case that says it is ineffective to fail to voir dire on the issue of race. But it is very clear that the Supreme Court and this court and all the other courts have found that a failure to properly conduct voir dire is ineffective assistance of counsel. Yes. I mean, you know the habeas law. The Supreme Court says the more general the authority you rely upon, the more latitude the state has. So what is then the most specific Supreme Court authority you would point us to that would make it pretty much obvious to the Ohio courts that counsel had to ask these questions? Well, I think first you start with Turner. The language in Turner says that this right only exists if counsel asks for it, which tells counsel that's your job to ask for it. It is. It's not going to happen unless counsel asks. I mean, as Judge Boggs pointed out, I mean, let's say that Turner is about a right, not an obligation. I mean, is there a case beyond that that you would point us to? We do this all the time. This is the way the issue of ineffective assistance of counsel develops, that the courts recognize that there is, in fact, a right. And then when counsel doesn't enforce that right, that's ineffective. I guess, I mean, my point is that it would seem like reasonable minds could differ as to whether it was strategically wise to ask these questions. And so if there is some Supreme Court authority that would make clear that actually the only reasonable approach here would have been to ask the question, that would be very helpful. If there isn't, that's usually a problem in habeas cases. But, Your Honor, if you're asking about whether or not this was a strategic decision, then you've already made the decision counsel should have asked. I don't follow. There's only one way it can be excused as a strategic decision, and that is the idea that counsel should have asked the question in the first place, but chose as a matter of strategy not to. Right. And why is that what happened? Because insufficient investigation? Is that what you're saying? I think that the lawyers didn't make any decision about doing voir dire in general. We know from the other assignment, the third assignment of error and the fourth assignment of error about how trial counsel did this case, that their performance at voir dire was woefully inadequate on several fronts. I don't think we can look at this. And I've tried to figure out some answer to your very question. Sure. What would be the strategic reason to not ask questions in this case? Well, I mean, I think the Ohio court pointed out what that reason is. But you cannot minimize the impact of race in this case by simply burying your head in the sand and hoping the jury doesn't get it. Because the issue of race started with the opening statement of the prosecutor, and it ran all the way through to the closing argument, where the prosecutor stands up and says a closing argument, the reason this happened was that John Stojets didn't want to room with a black man. The issue of race is rampant in this case. The issue of the Aryan Brotherhood, even if this had been a white-on-white crime, the issue of inquiring about attitudes towards the Aryan Brotherhood in a capital case, where the jury is given incredible discretion to decide whether somebody lives or dies, and you leave that sitting there, not asking what is your attitude towards a white supremacist organization, what is your attitude towards violence in prison, especially in a community like Madison area, where everybody on the jury had family and friends who worked inside that institution. And yet the counsels asked no questions, did not ask the judge to ask any questions. This is a Strickland claim, and so what about Judge Clay's question about prejudice? I mean, you have to show prejudice. Do we just assume it for the reasons you just recited? I think we look at prejudice in the same way we would in a Fourth Amendment case. Under Stone v. Powell, when you have an issue of ineffective assistance, you look behind to the underlying merits of the claim to determine whether or not, had the lawyers asked for this, what would have happened. And we know under Turner that the impact of that would have been to ask the questions. Now, how do we, at this point, all these years after, show that some juror on that case may or may not have harbored racial animus? And quite frankly, that's not a possibility at this point. We don't even know whether the jurors are alive. We were not given the ability to, this issue wasn't raised by post-conviction counsel, and they were able to litigate that. And we do have the issue of whether or not there was ineffective assistance of post-conviction counsel in this particular case. But that, being able to come back and demonstrate what Turner presumes to be the problem, under Turner there is a presumption if the questions aren't asked in a capital case when there's racial issues involved, that there was prejudice. Does Turner say that? It does. That's the difference in presumption when the idea that you might be letting a racially biased person on the jury. Now, here, though, in terms of the prejudice, in effect, for you to get a better outcome, what you need is a hyper-unprejudiced or prejudiced in your favor juror to get on. It's not that there's one person on the jury that's preventing a good outcome for you. And is there anything about the seek, you know, usually when you have that kind of claim, you say, well, the next alternate juror would have been much better, and I don't see any of that. No, and quite frankly, that's actually a part of the prejudice problem in this case, is that because the lawyers never ask for the questions, the record gives no indication whatsoever about the attitudes. And that exactly was the underlying principle that came through in Turner, is that it's the need to discover these items that creates. Well, it doesn't read quite like that. It says that it held that a defendant cannot complain of a judge's failure to question the veneer of racial prejudice unless the defendant has specifically requested such an inquiry. And the court further noted that should defendant's counsel decline to request for a deal on the subject of racial prejudice, we in no way require or suggest that the judge broach the subject sui sponte. That sounds quite a bit different from the court saying that the issue was required to be raised. And the problem with the way the argument is, just speaking for myself as presented here, it seems as though you're asking us to presume prejudice based on structural error from failure to ask the jury about racial prejudice since there's no evidence of racial bias by any of the jurors in the absence of the voir dire. So for your argument to prevail, it would have to be deemed to be a structural error, wouldn't you say? It would. And I think Turner tells us that if the defense lawyer asks for the questions and the judge refused, that would be structural error. But Turner doesn't require the defense attorney to ask for that. No, I think what it's getting at is that it's only required if the defense counsel asks for it. But how is that different from all kinds of trial rights? A person has an absolute right to testify, but he doesn't if he isn't called. Right. And it's a strategic decision frequently as to whether to call him or not. So you can't presume error and prejudice from that. You seem to say, well, you can't even look at a possible strategy until after you've already decided that it was faulty lawyering. And that seems a little, I mean, in my, what's the difference between my kind of example and this case, then, if you're saying that if you have a right to it, then you must do it? I don't think there is a must. I don't think there's a must that the lawyer must ask these questions. But once you say that the defendant has the right to have these asked if counsel asks for it, that in those cases in which it should be done, it is ineffective for counsel to not do it. But right there you just said in those cases where it should be done, who judges and how whether it should be done. And I think you have to, if there is a strategic issue, I think we look at this in the same way we would try to resolve in habeas a Fourth Amendment suppression issue. And that is through the lens of stone versus power. And that you don't look to the issue of whether or not the suppression motion will be granted when you go back. You ask whether or not defense counsel was ineffective for failing to raise the suppression issue, which then allows you to litigate the Fourth Amendment issue in habeas. Then getting to the merits. If that's the situation that we're faced with in this case, then the proper remedy is what you would do in a stone versus power situation. And that is remand it back to the district court. Let's have that evidentiary hearing. Let's do those fact developments. Let's find out from the dowdies whether they did in fact have any type of strategic interest in deciding what to do in this case. And let's go out and talk to the jurors and find out what was going on. But in order to look at that question, you have to be able to look at it and say, Mr. Stojic then has the opportunity to, in fact, prove prejudice by getting to the underlying facts of what happened. But simply saying, well, there could have been some magical strategic... Let me ask you this. If this were to go back for an evidentiary hearing and an inquiry is raised with the jurors, wouldn't the court and counsel have to invade the province of the jury deliberations at that point? Views on race may have been ventilated in the course of the deliberations of the jury. And without some indication that there's a problem with the jury in regard to the deliberations, we're not supposed to get into that. Except the Supreme Court just last term in the Peña-Rodriguez case recognized that race issues are different. And 606B does not prohibit development of things that happen inside the jury room when the issue is issues of racism. But when there's some hook that's come out of the jury room, right? In that case, what you had was some juror who... Right. There was at least some fact development that gave an indication that there was something wrong in the jury room. Nothing in the jury room. In this case, no. Let me ask you about your Stone v. Powell point because I didn't see, I mean, it is sort of a sub point, but I didn't see that cited anywhere in your briefs, that issue, that theory that you were spinning. Did I miss it or is it... No. But I have been recently appointed, Your Honor. Okay. So you're entitled. I just wanted to make sure I had not missed it. The way of framing this, I mean, there's a number of situations like this, right? Ake v. Oklahoma says inmates, defendants have a right to expert assistance. It's ineffective assistance when lawyers don't ask for that assistance. We find... Psychiatric assistance, right? Correct. You really can't go beyond that in habeas, right? No. But in the state courts, the lower courts and the federal courts in non-capital cases have recognized the need under Ake to provide other types of experts. And the idea behind Ake is that when lawyers have the right, the ability to get assistance for their clients and they don't ask for the assistance, that can be ineffective assistance. We don't need a case to come back and say it's ineffective assistance if you didn't call this specific type of expert. The same thing comes up in the issue of the voir dire. You have the right to have this voir dire conducted. That means that it's incumbent on the defense counsel to make a strategic decision, maybe to ask or not ask. But in this particular case, there could be no strategic decision to ignore this issue. This issue was going to be the entire prosecution's case. Well, I mean, the case was proving that Mr. Stojatz stabbed the man to death. No, their case to get death was we want to kill the Aryan Brotherhood white supremacist. No, I thought the aggravating factor that raised the possibility of death sentence here was that the crime was committed in a penal institution. Yes, that's the aggravating circumstance that the jury is told. But Turner and all of the other cases, Lockett versus Eddings, all of the cases recognized. And when the jury is considering these cases, they are listening to everything that's being said to them. That's why the prosecutor read those statements into the record 19 times in which they attribute. A law of the aggravating factor was that the stabbing, that the crime occurred in a detention center. That's what makes it a capital case. But the prosecutor repeatedly argued that this was the racial motivation of this case, that it was the Aryan Brotherhood, that Mr. Stojatz packed his bags and was ready to move out as soon as this attack, before the attack happened, because he didn't want to house with a black man. Those are the arguments that the prosecutor was making to the jury at the mitigation phase. I mean, for all we know, there might have been some racist whites on the jury. Very possible. You know, that more than balanced out the concern here. It's very possible. So, I mean, how in the abstract do we say that he was prejudiced? Then we send it back and let's have a hearing. What case lets us do that? I mean, because, sorry, go ahead, answer. No, I'm done. I mean, because your sort of theory would seem to be that if they had asked more questions, they might have been able to get more racist whites and less un-racist whites on the jury. In which case, I'm sure the prosecutor would have used their challenges for cause on the fact that there were... If that's true, then your prejudice goes away. I mean, to be crass about it, if you're the defense attorney and following your theory, that is, if rather than the theory being no, guys, no matter what they say, this is just a fight in prison, and you shouldn't treat it, your theory seems to be he should say, yeah, this is a fight between blacks and whites, and I want a juror or two who will stay on our side. Isn't that the theory that you're advancing? I mean, nothing wrong with that as a theory. I actually think there's something very wrong with that. No lawyer would ever make a strategic decision that I can get a jury of racists on my panel to save my client's life. Why not? Zealous advocacy, that would be exactly what you want here, right? With all due respect, Judge, no. The statement that is raised in one of these other points that got in the newspaper about, why is anybody putting me to death? I just killed an inmate. Isn't that the kind of juror you want? I killed a black inmate. Isn't that the juror you want? You may want that juror. Okay. You don't have a right to that type of juror. But the only theory seems to be you should have asked questions that would have helped you get that kind of juror. Well, unless we're willing to presume that the people in Madison County were racists so that they could count on that type of jury pool coming in, you can't say that was their strategic decision. So you're saying he should have inquired about whether there were any black jurors that would have been biased against an Aryan nation? Whether there were black jurors who were biased against the Aryan Brotherhood or whether there were white jurors who were biased. There are white people who are offended by the word nigger that was used repeatedly in this trial. There would be white people who would be offended and consider death for a white supremacist if they wouldn't consider death for somebody else, if they would consider the racial motivation of this case as a reason to kill. And we know it in this particular case because one of the jurors actually said, during voir dire in response to a question by the prosecutor, well, sometimes there are people who just the state needs to take care of. Now, I don't know whether that juror meant that as a race issue or as a poverty issue or as a bad issue. I don't know what he meant by it. Of course, we don't know because the lawyers didn't ask any questions. But it's very easy to look at that and say, John Stoja, it's the Aryan Brotherhood and all that it stands for is why we have the death penalty. Regardless of the aggravating circumstance of this happened to have occurred in a prison. That could have been an entirely reasonable judgment on their part. And you need to know because if that's the case, that juror should never have sat on this case. Because they're considering his membership in the Aryan Brotherhood as opposed to stabbing the guy allegedly? As opposed to the fact that this occurred inside a prison. That's it. That the aggravating circumstance that they should have been considering is only that it occurred in a prison. The issue of the race, the issue of the battle between the white gang and the black gang, all of that is not supposed to go on death's side of the table. But we know the reality. We know why. That's why the prosecutor used that stuff in this trial. I think we got that part. If there are no further questions, I'll reserve my time for revoting. All right. Good afternoon. I'm Jocelyn Lowe on behalf of the warden in this case. And I think that Mr. Benza's final point that race is not supposed to be a part of this is the strategy that the trial attorneys adopted in this case. The defense attorney's theory of the case was that this occurred inside of a prison because of the prison environment. And that's the evidence that they presented. That Mr. Stojatz only intended to have a fight, to stand up for Doug Haggerty, to kind of send a warning to Mr. Watkins. And the defense counsel's goal, the strategy that the Ohio Supreme Court and the district court read into this, was to downplay the issue of race in this case. It was the prosecutor's goal to emphasize the racial motivation to demonstrate that Mr. Stojatz entered Adams A. with an intent to kill D'Amico Watkins. And that's why those other statements came into evidence, was to show that Mr. Stojatz did not have an accident, it wasn't an act of self-defense, that this was an intent to kill case that occurred inside a prison because the state was required to prove purpose to kill. Well, was that a clearly foolish judgment given how much the state emphasized race and the ease with which counsel presumably could have foreseen that emphasis at trial? No, that's not a foolish judgment. It was a wise judgment on their part because they knew that the racial factors in this case could be very divisive. And from the beginning of, I think, their voir dire and the decision not to voir dire about race plays into the theme that trial defense counsel adopted throughout the case and through mitigation, which was to talk about Mr. Stojatz's personality and how his personality and in mitigation his PTSD led to this event rather than to emphasize the ties to the Aryan Brotherhood and the folk nation feuds, so to speak. I mean, how detrimental to that strategy would it really be to ask maybe some succinct questions in voir dire, not sort of, you know, dwelling on it, that would try to draw out anybody. I mean, you said this is racially divisive, you know, to try to draw out jurors that would be prejudiced against the defendant as a result of that divisiveness. The danger, one, in second-guessing the trial court strategy is that jurors sitting in voir dire might then be keyed into that issue and wondering why they had been asked about racial motivation. They're about to get hit over the head with it, right, in like openings and closings and throughout the trial. So, I mean, is there really a downside? There could be a downside. I mean, as a practical matter? That's exactly the strategic decision that trial counsel is making instead by choosing to ask about whether or not self-defense would be something that jurors would consider or listen to evidence about or defense of others. Was the voir dire individual out of the earshot of everyone else or were the jurors, you might say, all when each was being questioned, were they available? I don't remember if it was individual or in the presence of others. I know there was an opportunity at least to approach the bench and ask to speak privately with the judge, but I don't remember from the record, Your Honor. I apologize. We can check. Thank you. But the question of whether or not there was a possibility is the exact kind of strategic decision that this court and in Holder v. Palmer noted that actions in voir dire are strategic decisions, and the decision of whether or not to voir dire on race or whether to voir dire on other issues is exactly the type of strategic decision that Strickland tells us not to second guess and that the doubly deferential layer of review in habeas means that we don't second guess the Ohio Supreme Court's decision that this was a reasonable strategy. I also think that the attempts to avoid the prejudice prong of Strickland fail. The Supreme Court noted that, number one, a structural error still requires a prejudice showing if it's raised as an ineffective assistance of counsel claim last term in Weaver v. Massachusetts. So the attempts to say, well, the failure to ask about voir dire under Turner means it's a structural error, doesn't get around the fact that there needs to be a prejudice showing in this case, and there's no prejudice demonstration in this case. The voir dire that was conducted shows that we had jurors who didn't make any statements that would lead us to believe that they were racially biased, and a number of them expressed reservations and doubts about even imposing the death penalty, as is discussed in response to one of the other assignments of error in this case. And because there's not a showing of prejudice or a showing of deficient performance, the ineffective assistance of counsel claim should be denied. The Ohio Supreme Court's determination to deny this on the merits was reasonable. And the fact that, as Mr. Benza conceded, there's no United States Supreme Court case holding that this decision would be ineffective assistance of counsel is determinative in this case because it's a habeas case on review. Because he only addressed that first point, there's only one other point I wanted to raise in regards to the grand jury transcripts request. In his brief on page 53, Mr. Stojic's attorneys note that the warden has the grand jury transcripts, but in fact the warden does not have access to grand jury transcripts because they're not the prosecutors in this case. The Ohio Attorney General's Office has to go through the same hoops of making a particularized showing that Mr. Stojic's would. Your adversary said that he was going to rely on the first two, and we kept him from getting, in a sense, to the second part, which is basically the Brady-Napua issue, which I take it has to do with some type of prison medical records. Yes, Your Honor. Can you give us a little background on that in the sense that were those records available if a discovery request of some sort had been made, or were they only available if the state decided sua sponte to produce them under Brady? Your Honor, they're actually available to the prisoner outside of the discovery context pursuant to Ohio statute. Is that because they're his own records? Because they're his own records. Upon a written request, they can be released to his physician or his attorney. It's Ohio revised code 5120.21C2. 5120.21, capital C, Arabic 2? Yes. Right. This claim has a number of procedural problems in addition to the merits problems. It was first raised in a motion to amend. The district court granted it tentatively and allowed this portion of the case to be returned to state court, but didn't stay the rest of the proceedings. The state courts dismissed these claims as untimely when they were raised before that court, saying that Mr. Stojic could have obtained his records pursuant to 5120.21 and could have done so sooner than he did, and so therefore the claims were untimely under state law. So when he returned to the district court, the district court revisited its decision to allow the motion to amend and found that Mr. Stojic had not exercised due diligence under Rule 15C in Mail v. Felix and denied the claim as untimely. It made an alternative finding that the claim was procedurally defaulted because it had been barred as untimely under state procedural rules, and finally it denied it on the merits. So there's three separate grounds, of course, to deny it, and the Rule 15 finding, the first one that the district court made on page ID 9098, is appropriate because Mr. Stojic, as I said, could have obtained these records at any time under the Ohio Revised Code, but failed to do so for a number of years after his trial was completed, or even during his trial he could have gotten them. He talks about the material that's found in these records in his unsworn statement and disclosed the contents of them to his expert witness, although he didn't provide him with records. So that claim is based on, there's a Brady claim in it, and I think it's NAPU, and I apologize if I'm mispronouncing that, because the prosecutor during the trial learned that they were going to call an expert to testify about having diagnosed Mr. Stojic with PTSD, and so to cross-examine him this prosecutor asked a series of questions about whether or not he'd reviewed these records, and the expert stated that he had not, he'd relied exclusively on Mr. Stojic's retelling of multiple accounts to him. And Mr. Stojic claims that this-  A scar on his neck. He also talked about having witnessed his grandfather's suicide and some other attacks in the prison system. Did the state records ever get into a record anywhere in this? That is, if we wanted to look at them, where would we look for them? The ODRC records were presented to the state courts in a second post-conviction petition. The ODRC records, second, state second post-conviction. Correct. Were those carried forward into anything in the federal court record, or would we have to go to state records? I believe they should be part of the federal appendix, but I apologize, I don't know that answer off hand. Okay, we can look. Thank you. I apologize. The underlying claim was meritless because the state records weren't Brady material, and the questioning of the expert wasn't NAPU, but the untimeliness claim is a bar in and of itself. I think that's clear under this court's precedent, including in Hill v. Mitchell. The 15C only allows relation back if records are presented within one year, of which they could have been obtained with due diligence, because he didn't exercise due diligence in obtaining them. The denial of the motion to amend under Rule 15 was appropriate, and so is the procedural default claim. I hope that answers any questions about the second claim that you may have. I know that he wanted to reserve part of his time to address that, and thank you for bringing it to my attention. If there are no further questions, I'll ask that you affirm. Thank you, Your Honors. Thank you. Judge Boggs, in response to your question, there was individual voir dire conducted on death qualification in this case, so any idea that maybe the entire jury pool would have been tainted by hearing this would not have occurred. They did individual death qualification. That's the normal process in Ohio, and that's what happened in this particular case. As the Attorney General points out, there's no evidence of strategy in this case. There's nothing that indicates that the lawyers made any conscious decision about what to ask during voir dire and what to do. Turning briefly to the Napoo Brady issue, the prosecutors in this case, and the Attorney General in this case, have relied consistently on the fact that it was perfectly reasonable for the Dowdies to rely on the prosecutors to comply with their obligations under Brady and disclose the evidence. There was no ineffective assistance of counsel, as the trial court in this case determined, because they didn't do an investigation outside of relying on the prosecutor turning over these files. And we know that these files were in the prosecutor's possession during the trial because the prosecutor repeatedly referred to them, but never disclosed them to the Dowdies. And the issue under Napoo was the prosecutor cross-examining Dr. Eimer and telling the jury that Dr. Eimer's testimony was invalid because there was no documentary evidence that the attack actually occurred beyond Mr. Stojat saying it happened. And what's revealed in the DRC records that were finally dislodged from the state of Ohio was that Mr. Stojat had a 5 to 6 inch cut across his throat, that the gaping wound was 4 inches wide, that he was covered in blood as he came off of the yard and didn't wait for a stretcher so that he could get to the infirmary, and that he was immediately evacuated to the local hospital for treatment. Yes, Dr. Eimer should have had that record and he should have been able to tell the prosecutor, no, your characterization of this as just a scratch is wrong. Is his scar visible? It is. I don't know whether it was at trial. How effective should we assume this attempted impeachment really was when the man is sitting there with a large scar across his throat? Well, first, we don't know whether the jury could see it. If Mr. Stojat was my client at trial, as I'm sure you would all have done, he would not have been dressed in prison garb. He would have had a coat and tie on. So whether he has a cut across his throat may not have been visible. Is it your burden to show that it was not visible? No. Whether it's visible or not isn't the issue. Well, it might be if he's sitting there with an enormous scar across his neck. It rather corroborates. Certainly is nothing in the record that they pointed it out to the jury to show? They certainly would have known. I mean, doesn't that sort of make it part of your ineffective assistance claim, not part of a NAPU claim? Because if they had wanted to engage on this issue, and again I can think of some reasons why they might not want to, but if they wanted to engage on it, as they said, they could have gotten the records. They could have. It looked like just a scratch to you, jury? That might be pretty effective if that was what the situation was. But again, if you're trying to say this guy isn't so bad all the time as he was some of the time, maybe you don't want to show that he's the kind of guy that would get a six-inch cut in his neck. Except they put that evidence on. And the issue in this is the defense did. The defense put on the evidence of the attack. And the entire foundation of Dr. Imer's diagnosis of post-traumatic stress were the assaults that occurred in prison. This wasn't an allegation by the prosecutor saying that the attack never happened. What the prosecutor was doing in this case was eliminating the only person who testified that did not have a bias, which is exactly what the prosecutor said. You relied on John Stojatz and his sisters to tell you this information. And all Dr. Imer had to say is, no, I reviewed the DRC records that were in the prosecutor's possession at the time. And the attorney general stands up here and says it was not ineffective for them to rely on the prosecutor to do discovery. And that Mr. Stojatz is somehow not diligent for trusting the prosecutor to comply with their constitutional obligations. The difference between things that are in records that if you go looking for them there might or might not be something there, presumably they knew at trial that this was what Stojatz was saying and could be corroborated from those records. So they chose not to get them. They chose to do nothing in this case except rely on the prosecutor for discovery. That was their strategy. This is a Brady claim, not ineffective assistance? Correct. Because the prosecutor should have turned it over. Okay. But, I mean, you know, why is it the prosecutor's fault that they just didn't ask? They didn't, if I may, Your Honor. They did file the discovery request, and the prosecutor's response is, don't worry, we will liberally comply with Brady. And then they didn't. And just like in Banks v. Of course, they filed a discovery request was for what, for anything? Just a general discovery request. And like in Banks v. Dretke, where the prosecutors hid evidence all the way through the case until habeas, and then did the exact same thing, stand up and say, oh, it's his fault for not catching us lying earlier. That's exactly the situation we have here. Is there really reason to think the case comes out differently if the defense was able to bolster the testimony of this expert with documents? Yes. Really? Yes. If the issue of post-traumatic stress is connected to this level of an attack, there's a reasonable probability that the jury gives life. I don't know. I mean, you say that. I'm not really feeling it. I mean, when you look at this case and the totality of it, it's not self-evident. If I may. The existence of post-traumatic stress is one of the most powerful mitigating factors there is. It's becoming more and more powerful every day because of what's happening. When guys come back from the war suffering from PTSD, we know what that means, and this jury would have known what that meant. Okay. Thank you. Thank you, counsel. Mr. Binzel, we know you've taken this assignment pursuant to the Criminal Justice Act, and we know that you do that as a service to our system of justice, so the court certainly is appreciative and would like to thank you for that. The case is submitted, and the court may be adjourned.